Below is an Opinion of the Court.

_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re: )
) Bankruptcy Case
JOHN M. HANLEY, ) No. 12-38801-rld7
)
               Debtor. )
_____)
)
SUSAN L. MURRAY, ) Adversary Proceeding
) No 13-03046-rld
               Plaintiff, )
)
  v. ) MEMORANDUM OPINION
)
JOHN M. HANLEY, )
)
               Defendant. )

     This adversary proceeding ("Adversary Proceeding") was tried before me (the "Trial") on October 28, 2013. Under the Pretrial Order (Docket No. 74), plaintiff Susan L. Murray ("Ms. Murray") asserted three exception to discharge claims against defendant John M. Hanley ("Mr. Hanley"): § 523(a)(2)(A) – fraud; § 523(a)(4) – embezzlement; and

Page 1 - MEMORANDUM OPINION

§ 523(a)(6) – willful and malicious injury.[1]

During the Trial, I listened carefully to witness testimony and the arguments of counsel. Following the Trial, I have reviewed my notes from the Trial, the admitted exhibits, the parties' Trial memoranda, and the Pretrial Order. I further have taken judicial notice of relevant entries on the docket and documents filed in the Adversary Proceeding and in Mr. Hanley's main chapter 7 bankruptcy case for purposes of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). I have considered the testimony and arguments presented by the parties. In addition, I have reviewed relevant legal authorities, both as cited to me by the parties and as located through my own research.

Based on that consideration and review, I have come to a decision. The findings of fact and conclusions of law stated in this Memorandum Opinion constitute my findings and conclusions for purposes of Fed. R. Civ. P. 52(a), applicable in this Adversary Proceeding pursuant to Fed. R. Bankr. P. 7052.

### Factual Background

This Adversary Proceeding is freighted with the baggage of a failed personal relationship.

Ms. Murray was divorced in 2003 after thirty-three years of marriage. During the marriage, her former husband handled the finances for the household/marital community. Ms. Murray operated a bakery from approximately 1996 to 2007 that was marginally profitable. She received

---

[1] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532.

Page 2 - MEMORANDUM OPINION

a substantial financial settlement in her divorce that she invested in certificates of deposit ("CD's") and a savings account at a discount brokerage firm. Ms. Murray established through her testimony that she is risk averse and is not a sophisticated investor. <u>See also</u> Exhibit D, p. 3.

Ms. Murray resides in Boise, Idaho. She met Mr. Hanley in 2006 through Match.com. He represented to Ms. Murray that he was financially secure. At the time that the parties first connected with one another, Mr. Hanley lived in Tucson, Arizona. In late 2007, after the parties had developed a relationship, Mr. Hanley moved into Ms. Murray's home in Boise.

Mr. Hanley listed his occupation on his Match.com profile as a "semi-retired securities trader." In his deposition, Mr. Hanley characterized his work in the securities field as follows:

> A[nswer]: Passion, love, love of the game.
>
> Q[uestion]: What game?
>
> A[nswer]: The stock market game. It's the best game in the world to me.
>
> Q[uestion]: Describe why that is.
>
> A[nswer]: It's just fun. When I sit in front of the screen and at 7:00 in the morning, or whenever it is, I can sit there for five or six hours and it's like one hour will have passed, and I've done it for 30 years. It's a passion. . . .

Exhibit 35, pp. 109-10. At some point, Mr. Hanley provided Ms. Murray with advice regarding investing in gold, from which she made some money.

In March 2009, the parties purchased a home together in Boise ("Boise Home"), with Ms. Murray paying 75% of the purchase price and

Page 3 - MEMORANDUM OPINION

Mr. Hanley paying 25%. Prior to purchasing the Boise Home together, the parties had a mutual commitment ceremony but never married. However, Ms. Murray changed her name to "Susan Murray Hanley." In August 2009, Ms. Murray bought out Mr. Hanley's interest in the Boise Home because Mr. Hanley did not want to continue to pay one quarter of the expenses for landscaping and otherwise improving and maintaining the Boise Home. Mr. Hanley had experienced losses in his securities trading. Thereafter, Mr. Hanley began to pay rent to Ms. Murray of $1,000 a month.

In April 2011, the parties entered into the $100,000 loan transaction (the "$100,000 Loan") that is the basis for Ms. Murray's Adversary Proceeding claims. The parties' respective versions of related events, as to which they each testified, are materially different, and I set out each party's assertions as to what happened separately, as follows:

A. <u>Ms. Murray's Version</u>

Ms. Murray and Mr. Hanley shared an office in the Boise Home. Ms. Murray testified that in the evening of April 8th, 2011, they were both working in the Boise Home office, and Mr. Hanley turned to her and asked, "Can I borrow $100,000?" She asked him why. According to Ms. Murray, Mr. Hanley told her that he had $100,000 in a cash account, but he had been losing money. He further told her that he had in excess of $500,000 in an account that he could not access. He could combine her $100,000 with his available cash for a total of $200,000 that he would invest very slowly and cautiously, taking "baby steps." Her loan to him would be "risk free," absolutely safe. He told her to "Trust me." Relying on Mr. Hanley's representations, Ms. Murray loaned him the

Page 4 - MEMORANDUM OPINION

$100,000.

The $100,000 Loan was documented by a promissory note ("Note"), a copy of which was admitted into evidence as Exhibit 7. The Note was dated April 8, 2011, with a principal amount of $100,000, bearing interest at the rate of 6% per annum. The Note reflects that it was due and payable in full in a year on April 8, 2012, and it is signed by Mr. Hanley. Ms. Murray testified that Mr. Hanley filled out the Note form and that it already was filled out when he asked her to loan him the money. According to Ms. Murray, Mr. Hanley told her at the time, "Just read it and sign. I am so sure of myself, I will give you 6% interest." Mr. Hanley deposited the $100,000 Loan funds to his TD Ameritrade account. See Exhibit 9.

In June, 2011, Ms. Murray testified that Mr. Hanley told her that he had lost all of the money that she had loaned to him. She was in shock, and an argument ensued. The next day, she ended her relationship with Mr. Hanley and asked him to leave. He was given a month to find a new place to live, and Ms. Murray understood that Mr. Hanley moved to Wilsonville, Oregon.

B. Mr. Hanley's Version

In his testimony, Mr. Hanley denied asking Ms. Murray to loan him $100,000. He remembered the conversation with Ms. Murray in the evening on April 8, 2011, as follows: Ms. Murray bemoaned the fact that her CD returns were so low. She asked Mr. Hanley how trading was going, and he responded, "Not well," or "About the same." According to Mr. Hanley, Ms. Murray initiated the $100,000 Loan transaction by asking, if she gave him a loan, would he give her 6% return? He asked, how much

Page 5 - MEMORANDUM OPINION

are we talking about?  She responded, $100,000.  He thought about it and said okay.  Mr. Hanley testified that Ms. Murray asked for a promissory note, and thereafter he got the Note form from Office Depot and filled it out.  Although Mr. Hanley confirmed that he signed the Note on April 8, 2011, he recalls talking about the $100,000 Loan transaction with Ms. Murray days before.  He confirmed that Ms. Murray wrote him a $100,000 check on April 8, 2011, which he deposited at Wells Fargo bank in their joint checking account, and sent on the Exhibit 9 check to TD Ameritrade from the Wells Fargo account.

Mr. Hanley denied that he told Ms. Murray that he had lost all of the money in June 2011, but he admitted that he told her he was losing in his securities trading activities.

On direct examination by Ms. Murray's counsel, Mr. Hanley admitted that at various times in February through April 2011, he had received notices from TD Ameritrade that he had fallen below the $25,000 minimum in his TD Ameritrade account "to participate in pattern day trading."  <u>See</u> Exhibits 3-6.  When asked at his deposition if he told Ms. Murray that he was "taking baby steps to make money," Mr. Hanley responded, "No, I don't use those words."  <u>See</u> Exhibit 35, p. 119.  However, in an April 10, 2007 e-mail communication to Ms. Murray, Mr. Hanley talks about taking a "baby step" in their relationship twice.  <u>See</u> Exhibit 2, p. 2.  In his deposition, Mr. Hanley also denied vehemently that he had told Ms. Murray in April 2011 that he had $100,000 but needed an additional $100,000 to make an investment.  <u>See</u> Exhibit 35, p. 97.  However, in an e-mail communication to Ms. Murray after the $100,000 Loan transaction had gone sour, Mr. Hanley stated: "Can you

Page 6 - MEMORANDUM OPINION

think of a single reason why I would take your $100k and add it to my $100k and intentionally lose it?" See Exhibit 21, p. 2.  See also Exhibit 26, p. 3.  In his testimony at the Trial, Mr. Hanley admitted that he may have told Ms. Murray that he had $100,000 and also admitted that he only had about $27,000 in liquid funds at that time.  His explanation is that he was thinking about "buying power," and his buying power for purposes of securities trading, based on $27,000 of available cash, would be approximately $100,000.  See also Exhibit 35, p. 86. However, he further testified in his deposition that, "I don't think [Ms. Murray] understands day trading buying power or any buying power." Id., p. 87.

C. Testimony of David Murray

The only witness other than the parties who testified at the Trial was Ms. Murray's son, David Murray.  He testified, without objection, as to a conversation that he had with Ms. Murray shortly after she made the $100,000 Loan to Mr. Hanley.  In that conversation, Ms. Murray told her son that at the time the $100,000 Loan transaction was discussed, Mr. Hanley told her that he had lost money in the market, that he needed to get back on track, and that her loan of $100,000 to him would give him $200,000 to invest.  As he remembered the conversation, Ms. Murray also told him that Mr. Hanley had told her that he would invest the $100,000 Loan money in a safe way, so that the Note would be paid in a year.

D. Subsequent Events

Mr. Hanley never repaid the $100,000 Loan.  Following the break-up of their relationship, the parties engaged in a lengthy

Page 7 - MEMORANDUM OPINION

"sitzkrieg" of communications, primarily by e-mail. See, e.g., Exhibits 20-23, 25-32. Of particular note, is a series of e-mails commencing with a suggestion by Mr. Hanley, in an e-mail dated December 13, 2011, that Ms. Murray write off the Note obligation as a bad debt for the 2011 tax year to set off against capital gains. See Exhibit 20. In a later e-mail, Mr. Hanley suggested how he could help make such a write-off work: "I CAN HELP YOU DO THIS. I WILL WRITE ANOTHER PROMISSORY NOTE DATED APRIL 8 OF THIS YEAR AND DUE DECEMBER 25TH OF THIS YEAR OR DECEMBER 1 OR WHEN EVER YOU WANT AND YOU CAN BALANCE IT AGAINST YOUR GAINS." See Exhibit 22, p. 2 (emphasis in original). Mr. Hanley and Ms. Murray both signed an amendment to the Note, setting a new due date for payment in full of December 28, 2011. See Exhibits 23, C and J, p. 6. The record reflects the parties' understanding that Ms. Murray in fact took the benefit of a bad debt deduction for nonpayment of the $100,000 Loan obligation by Mr. Hanley for the 2011 tax year. See, e.g., Exhibit J.

In December 2011, Ms. Murray changed her name back to "Susan Leigh Murray." See Exhibit 21, p. 1. Thereafter, communications between the parties continued, including a valentine card from Ms. Murray to Mr. Hanley with the following statements: "Please know there will Never be any legal action taken against you to recover our money. You have it in writing." See Exhbiit Q (emphasis in original). Mr. Hanley gave no consideration for that promise.

Ms. Murray never gave Mr. Hanley a cancellation and forgiveness of the $100,000 Loan obligation, as he requested. See Exhibit 27, p. 2. On or about September 7, 2012, Ms. Murray sued Mr. Hanley in Idaho state court to collect the Note debt. See Exhibit B. Mr. Hanley filed for

Page 8 - MEMORANDUM OPINION

relief under chapter 7 on November 29, 2012. The complaint in this Adversary Proceeding was timely filed on February 25, 2013.

### Jurisdiction

I have jurisdiction to decide the claims at issue in this Adversary Proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I).

### Discussion

I will discuss each of the claims tried pursuant to the Pretrial Order in turn, starting with § 523(a)(6).

1. Section 523(a)(6)

Section 523(a)(6) excepts from discharge debts for willful and malicious injury to the person or property of another. The standards for willfulness and maliciousness under § 523(a)(6) are distinct. In particular, in order to find that damages were the result of willful action, I must find that a debtor acted with either a subjective intent to harm or a subjective belief that harm was substantially certain to result from the debtor's conduct. See Carrillo v. Su (In re Su), 290 F.3d 1140, 1144-45 (9th Cir. 2002).

In this case, the evidence does not support a finding that Mr. Hanley intended to harm Ms. Murray when he borrowed the $100,000 from her. He lost her money. However, at the time he entered into the $100,000 Loan transaction, he did not have a subjective intent to lose the money and cause her harm, and in spite of his track record of losses in securities trading during the period preceding the $100,000 Loan transaction, I do not find that Mr. Hanley subjectively believed that he was substantially certain to lose Ms. Murray's money when he borrowed it from her. At the close of the Trial, I advised the parties that I

Page 9 - MEMORANDUM OPINION

intended to rule in favor of Mr. Hanley on the § 523(a)(6) claim, and I reiterate that ruling.

2. Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from a debtor's discharge debts for money obtained by "false pretenses, a false representation or actual fraud." The elements required to establish an exception to discharge claim under § 523(a)(2)(A) are:

> (1) the debtor made a representation [to the creditor];
> (2) at the time, debtor knew the representation was false;
> (3) debtor made the representation with the intention and purpose of deceiving the creditor;
> (4) the creditor justifiably relied on the representation;
> (5) the creditor sustained damage as the proximate result of the representation's having been made.

Mandalay Resort Group v. Miller (In re Miller), 310 B.R. 185, 194 (Bankr. C.D. Cal. 2004). See Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000). The creditor plaintiff bears the burden of proof on each of those elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991); First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986). However, fraudulent intent can be established through the presentation of circumstantial evidence. See, e.g., In re Adeeb, 787 F.2d at 1343; Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985); and In re Johnson, 68 B.R. 193, 198 (Bankr. D. Or. 1986).

In this "she said, he said" case, the decision comes down to who I found more believable when I heard their testimony. Ultimately, in spite of minor inconsistencies in her testimony, I find that Ms. Murray

Page 10 - MEMORANDUM OPINION

was more credible than Mr. Hanley about what happened when the $100,000 Loan transaction was discussed and implemented.

I find that Mr. Hanley initiated the request to obtain a $100,000 loan from Ms. Murray. I find that Mr. Hanley knew that Ms. Murray was risk averse and induced her to make the loan by promising that he would invest the money conservatively to provide her with a 6% return. However, when he made the representation that he would invest Ms. Murray's funds conservatively, he fully intended to, and did, use the loan funds to continue his high-risk day trading. I find that Mr. Hanley knew that if he had told Ms. Murray that he was going to use the $100,000 Loan for day trading, she would not have loaned him the money. I find that Ms. Murray justifiably relied on Mr. Hanley's representation that he would invest the loan funds conservatively because of their personal relationship. He had given her some sound financial advice before, and she had no reason not to trust him. Finally, the $100,000 Loan money was lost in a period of approximately three months or less because Mr. Hanley used it to fuel his day trading losses. I find that Ms. Murray suffered damages as a proximate result of her having loaned her money to Mr. Hanley based on his false representation as to how the money would be invested. I further find that the facts that the parties executed an amendment to the Note due date so that Ms. Murray could mitigate her loss and take a bad debt deduction for the 2011 tax year, at Mr. Hanley's suggestion, do not establish an "unclean hands" defense that would preclude Ms. Murray's § 523(a)(2)(A) claim. Accordingly, I find that Ms. Murray has met her burden of proof to establish each of the required § 523(a)(2)(A) elements, and I conclude that she is entitled to judgment

Page 11 - MEMORANDUM OPINION

in her favor on her § 523(a)(2)(A) claim.

3. Section 523(a)(4) Embezzlement

> Under federal law, embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1885). Embezzlement, thus, requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." In re Hoffman, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986); In re Schultz, 46 B.R. 880, 889 (Bankr. D. Nev. 1985).

Transamerica Comm'l Finance Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991).

At the outset, I note that this case does not present the typical embezzlement scenario of a bookkeeper or an accountant misappropriating employer funds, funds that he or she did not own, and attempting to conceal the misappropriation through false or misleading accounting entries. Mr. Hanley asked Ms. Murray for a $100,000 loan, and she gave it to him. When the $100,000 Loan funds were removed by Mr. Hanley from the parties' joint Wells Fargo account and transferred to Mr. Hanley's TD Ameritrade account, he owned them. Mr. Hanley was obligated to repay the $100,000 Loan, with 6% interest, pursuant to the terms of the Note. He was not required to account to Ms. Murray for the disposition of the particular $100,000 that she gave him, so long as she was repaid as agreed. I do not find that Mr. Hanley misappropriated funds in his possession as a nonowner. Accordingly, I conclude that Mr. Hanley is entitled to judgment in his favor on Ms. Murray's § 523(a)(4) embezzlement claim against him.

Page 12 - MEMORANDUM OPINION

## Conclusion

Based on the foregoing findings, analyses and conclusions, Ms. Murray is entitled to judgment in her favor on her § 523(a)(2)(A) exception to discharge claim against Mr. Hanley. His debt to her will be excepted from his discharge on that basis. Ms. Murray's claims under §§ 523(a)(4) and (a)(6) will be dismissed with prejudice. Counsel for Ms. Murray should prepare and submit a Judgment consistent with this Memorandum Opinion, subject to approval as to form by counsel for Mr. Hanley, within ten days following the date of entry of this Memorandum Opinion.

# # #

cc: Tara J. Schleicher, Esq.
Daniel T. Garner, Esq.